GATLIFF COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11084.   Promulgated October 10, 1927.

1. In determining the March 1, 1913, value of a coal mine for depletion purposes, the future expected profits from a commissary operated in conjunction with said mine can not be included in the future expected profits from the sale of coal.

2. Under the circumstances of this case, petitioner is entitled to deduct from the expenses theretofore charged against the mining of coal certain expenses attributable to the operation of the commissary in determining the March 1, 1913, value of the leasehold for depletion purposes.

*H. B. Lindsay, Esq.*, for the petitioner.
*A. George Bouchard, Esq.*, for the respondent.

This proceeding is for the redetermination of a deficiency in income and profits taxes for the year 1919 of $6,297.94. Two questions are raised by the pleadings: (1) Whether the future profits realized from the operation of the petitioner's commissary should be taken into consideration in determining the March 1, 1913, value of its property for depletion purposes, and (2) if not, whether gross profit per ton of coal should be increased by the allocation of certain expenses to the commissary which were charged against coal, the March 1, 1913, value having been determined by present-value method.

### FINDINGS OF FACT.

The petitioner is a corporation organized in 1909 under the laws of the State of Kentucky, with principal offices at Williamsburg, Ky. The purposes of the corporation as set out in its charter were (a) the mining, selling and shipping of coal, (b) the building and renting of houses, (c) the erecting and maintaining of commissaries in con-

nection with the mining, shipping and sale of coal and products of these and a general mercantile business.

The petitioner on March 1, 1913, was the owner of a lease on a certain boundary of coal land situated in Kentucky, which lease provided that the lessee should pay a fixed rental, whether coal was mined or not, of $5,000 for the calendar year 1910 and $6,000 per year for each year thereafter; that the lessee should not assign nor transfer said lease nor any interest therein nor sublet said premises, nor any part thereof, without the written consent of the lessors, except it may rent houses to its employees.

The leasehold is situated in a mountainous country. There was no population on or near the property from which labor could be obtained to operate the property and no adequate mercantile establishments on or near the property to supply the laborers and employees of the petitioner with the necessities and comforts of life. Consequently it was necessary, in order to carry on and maintain its corporate functions, for the petitioner to construct the necessary houses for use of its employees, to establish and maintain an adequate commissary and mercantile business, and to provide suitable buildings therefor.

It is customary and desirable for coal-operating companies situated similarly to the petitioner to operate a commissary and store in connection with their business because of the profits derived therefrom and for the purpose of keeping the employees contented and satisfied.

The petitioner located a camp on the property near the head of a small stream in a little valley between 300 and 400 feet in width, between parallel ranges of mountains, and a railroad about 19 miles in length was constructed to the camp. The petitioner also installed and maintained a commissary and erected houses for its employees.

By 1913 there were about 400 men in the employ of the petitioner and about 2,500 people living in the camp. The petitioner had practically a monopoly on the trade of the people living in its camp and consequently realized large returns from its commissary. The commissary accounts were kept separate on the books of the company and showed gross sales, inventories, and expenses, such as cost of goods, freight, and salaries of commissary employees, but no charge was made for taxes, insurance, officers' salaries, directors' fees and other overhead expenses. The profits on sales from the commissaries thus shown by the books were as follows:

| | | | |
|---|---|---|---|
| 1909 | $9,028.67 | 1913 | $33,805.46 |
| 1910 | 15,352.96 | 1914 | 31,250.16 |
| 1911 | 23,040.83 | 1915 | 32,573.60 |
| 1912 | 35,300.14 | | |

The books further show merchandise inventories as follows:

| | | | |
|---|---|---|---|
| 1909 | $4, 025. 00 | 1913 | $26, 010. 00 |
| 1910 | 10, 443. 00 | 1914 | 25, 289. 00 |
| 1911 | 16, 957. 00 | 1915 | 24, 851. 00 |
| 1912 | 21, 504. 00 | | |

The overhead and general expenses of the petitioner were as follows:

SALARIES AND FEES

| | 1909 | 1910 | 1911 | 1912 | 1913 | 1914 | 1915 |
|---|---|---|---|---|---|---|---|
| President | $900. 00 | $1, 200. 00 | $1, 200. 00 | $1, 962. 00 | $3, 000. 00 | $2, 940. 00 | $2, 940. 00 |
| Vice president | | 1, 200. 00 | 1, 215. 70 | 2, 013. 80 | 3, 000. 00 | 2, 940. 00 | 2, 940. 00 |
| General manager | 875. 00 | 1, 200. 00 | 1, 218. 83 | 1, 804. 00 | 3, 000. 00 | 2, 940. 00 | 2, 940. 00 |
| Secretary and treasurer | 675. 00 | 1, 200. 00 | 1, 200. 00 | 1, 500. 00 | 1, 300. 00 | 1, 200. 00 | 1, 200. 00 |
| General superintendent | 1, 125. 00 | 1, 786. 75 | 1, 628. 84 | 1, 698. 34 | 1, 732. 31 | 1, 708. 89 | 1, 719. 05 |
| Bookkeeper and scrip clerk | 495, 50 | 1, 609. 88 | 1, 790. 90 | 2, 408. 73 | 2, 306. 15 | 1, 983. 36 | 2, 003. 88 |
| Auditor | | | | | | 120. 00 | 120. 00 |
| General legal expense | | | | | | 600. 00 | 600. 00 |
| Directors' fees | 300. 00 | 300. 00 | 300. 00 | 300. 00 | 300. 00 | 300. 00 | 300. 00 |
| Total | 4, 370. 50 | 8, 496. 63 | 8, 554. 27 | 11, 086. 87 | 14, 638. 46 | 14, 732. 25 | 14, 762. 93 |
| Taxes | 901. 08 | 2, 533. 77 | 3, 028. 13 | 1, 897. 17 | 1, 988. 06 | 2, 330. 44 | 2, 515. 10 |

Each of the officers performed duties in connection with the operation of the commissary. A large part of the secretary-treasurer's work was connected with that branch of the business. All of the above salaries, fees, and taxes were charged against the mining and selling of coal. One-third thereof is a reasonable apportionment to the commissary business for the years in question. The expense of heating the two commissary buildings from 1911 to 1915, inclusive, was $800 annually, all of which was also charged to the mining of coal.

On March 1, 1913, there remained unmined from the leases then owned by the petitioner, 4,548,355 tons of coal. The amount of coal mined from the leased premises was as follows:

| | Tons. | | Tons. |
|---|---|---|---|
| 1909 | 88, 300 | 1915 | 24, 851. 00 |
| 1910 | 197, 502 | 1916 | 290, 916 |
| 1911 | 256, 614 | 1917 | 230, 133 |
| 1912 | 303, 012 | 1918 | 273, 850 |
| 1913 | 313, 299 | 1919 | 210, 676 |
| 1914 | 251, 842 | | |

OPINION.

MORRIS: The petitioner contends that in determining the value of the leasehold for depletion purposes there should be included in the future estimated profits the anticipated profits from the commissary. Its argument is based on the fact that the conducting of a mercantile business was a necessary incident of its mining operations

and customary for the coal mining industry to maintain such stores in order to hold the men in their employment. The commissary business was profitable for the petitioner and undoubtedly necessary in the operation of its mine. Such considerations, however, are not determinative of the question involved.

Section 234 (a) (9) of the Revenue Act of 1918 provides, " In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: *Provided*, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: * * * "

The only value upon which depletion is allowable is the value of the mineral deposit in the ground at the basic date. The right to operate a commissary is not such an asset as is subject to a depletion allowance. Whatever value that right may have therefore can not be taken into consideration in determining the value of the petitioner's property for depletion purposes. The action of the respondent in eliminating from the estimate of future expected profits to be derived from the leasehold's certain expected future profits from the commissary, was correct.

The second contention raised by the petitioner is that the respondent undervalued its leasehold interest for depletion purposes, although the commissary right may not be included therein, in that certain expenses were charged to coal which were attributable to the commissary, thereby decreasing the profits from the mining of coal and reducing the March 1, 1913, value based on anticipated profits. We are satisfied from the evidence that the expenses for the period 1909 to 1915, used by the respondent in the ascertainment of profits, on which the March 1, 1913, value was based, erroneously included charges against the cost of production of coal which were attributable to the commissary. The commissary accounts were kept separate on the books of the company but only showed such expenses as cost of goods, freight and salaries of commissary employees. No charge was made for taxes, insurance, officers' salaries, directors' fees, and other overhead expenses which were all charged against the mining and selling of coal. In our opinion, a reasonable apportionment of the officers' salaries and taxes for the years 1909 to 1915 is one-third to the commissary and two-thirds to the mining of coal. As all of these expenses were charged against the mining of coal, the profits from that branch of the business from 1909 to 1915 should be recomputed

by eliminating therefrom one-third of the officers' salaries and taxes, as set forth in the findings of fact. In addition, there should be deducted from the expenses of mining coal, $800 for heating the commissary buildings for each of the years 1911 to 1915, inclusive. The March 1, 1913, value of the property for depletion purposes should then be computed by the same method as that employed by the respondent, and not controverted by petitioner.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by TRAMMELL and LITTLETON.